IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROBERT JOSEPH KING   *

    Plaintiff   *

        v   *     Civil Action No. DKC-17-1654

DR. ONWUANIBE[1] and   *
DR. SCHRUMPF
  *

    Defendants
                           ***

## MEMORANDUM OPINION

Plaintiff Robert King filed a motion for temporary restraining order which was construed as a complaint filed pursuant to 42 U.S.C. § 1983. (ECF No. 1). Defendants were directed to show cause why the injunctive relief sought should not be granted. (ECF No. 3). Because Defendants' response (ECF No. 4) refuted King's allegations and relied upon materials outside of the original pleadings, this court construed the response as a motion for summary judgment and advised King of his right to file a response in opposition. (ECF No. 6). King filed a response in opposition (ECF Nos. 8 & 9) and Defendants filed a reply (ECF No. 10). A hearing is not necessary to determine the matters pending. *See* Local Rule 105.6 (D. Md. 2016). For the reasons that follow, King's request for injunctive relief will be denied and the complaint dismissed.

I.     Background

    A.     Complaint Allegations

Plaintiff Robert King is a patient involuntarily committed to the custody of the Maryland Department of Health and currently hospitalized at Clifton T. Perkins Hospital Center ("Perkins"). He claims that on June 9, 2017, he attended a meeting with Dr. Onwuanibe, a

---

[1]     The Clerk will be directed to correct the spelling of Defendant Onwuanibe's name.

psychiatrist, and Dr. Schrumpf, a psychologist. (ECF No. 1 at p. 1). King states that during that meeting, Dr. Onwuanibe told him she thought he was "getting 'sick' and therefore she was going to increase [his] Lurasidone (Latuda) dosage from 20 mg to 40 mg." (*Id*). King relates that he has had two Transient Ischemic Attacks ("TIA") during his hospitalization at Perkins and that Lurasidone is known to cause strokes in elderly patients.[2] (*Id*. at pp. 1 – 2).

King claims that he was given a 60 mg dose of Lurasidone by Dr. Onwuanibe in 2016 and experienced left-sided facial paralysis, which he claims is an indicator and symptom of a stroke. (*Id*. at p. 2). On October 22, 2016, King complained of the facial paralysis to his somatic doctor, Dr. Shesadri, and expressed his concern regarding the use of Lurasidone. (*Id*). King states that he was "eventually taken to the University of Maryland Medical Center ("UMMC") and given an MRI." (*Id*). He claims that the MRI results revealed "the existence of the past ischemic disorders." (*Id*). King states that following his trip to the UMMC, he returned to Perkins and discussed his Lurasidone dosage with Dr. Onwuanibe. King agreed to take a lower dose (20 mg) and claims the facial paralysis "subsided to a tolerable level" as a result. (*Id*).

King claims that despite this history of TIAs and facial paralysis experienced with the increased dose of Lurasidone, Dr. Onwuanibe ordered an increase in his dose of Lurasidone from 20 mg to 40 mg for the purpose of "knowingly, willfully, maliciously and deliberately" causing King "to experience an exacerbation of facial paralysis which may eventually lead to an episodic

---

[2] Defendants provided the affidavit of Inna Taller, M.D., in reply to King's opposition and provided the following information about strokes and TIAs:

> A stroke is the lay term used to describe a major cerebrovascular event that most often stems from a blood vessel occlusion, leading to brain cell death. A stroke, unless caught early, causes an individual to lose functions like feeling, movement, speech, eye-sight, etc. either completely or partially and permanently. A transient ischemic attack (TIA), on the other hand, is a minor cerebrovascular event (mini stroke) from a blood vessel occlusion that may present with similar but less severe symptoms and resolves within 24 hours without any intervention. There is no brain-cell death associated with the TIA and no permanent loss of function.

(ECF No. 10-1 at p. 2).

stroke, physically incapacitating" him. (*Id*). King asserts that Dr. Onwuanibe's ulterior motive is to incapacitate him so that he cannot "sufficiently and fully" prosecute his lawsuit filed as Civil Action DKC-16-3804.[3] (*Id*). He further claims that Lurasidone is "known to induce strokes in those persons who are prone to such strokes" and Dr. Onwuanibe is attempting to "physically and mentally incapacitate" him. (*Id.* at p. 3).

King alleges that Drs. Onwuanibe and Schrumpf "are attempting to intimidate, coerce, prohibit, hamper, hinder, prevent and punish the Plaintiff for his initiating his lawsuit against them in Federal Court by prescribing medications that would either physically and mentally induce a stroke in the Plaintiff or to overmedicate and oversedate (sic) the Plaintiff to such a degree as to render the Plaintiff incapacitated and incapable to adequately, sufficiently and fully prosecute Plaintiff's lawsuit in [Civil Action DKC-16-3804] now pending before this Honorable Court." (*Id*). King further avers that this court has the authority to order the United States Marshals Service to take custody of him, remove him along with all of his property from Perkins, and take him to either a federal detention center under the federal witness protection program or to a local federal regional hospital. (*Id*. at p. 4). He states that he is a material witness in Civil Action DKC-16-3804 and permitting Defendants to continue to medicate him as described will render him unable to provide evidence or prosecute his claims. (*Id*. at pp. 4 – 5).

B. Defendants' Response

Defendants explain that King was committed to the custody of the Department of Health and admitted to Perkins on May 14, 1999, after he was found Not Criminally Responsible on charges of second degree assault and carrying a concealed weapon in the Circuit Court for Prince George's County. (ECF No. 4 at Ex. 2, p. 1). On March 15, 2007, during his hospitalization,

---

[3] *King v. Shrader, et al.*, Civil Action No. DKC-16-3804 (D. Md. 2016) concerns Plaintiff's claim that he was denied a job assignment at Perkins in violation of the Americans with Disabilities Act.

3

King was convicted of second-degree assault and sentenced to serve three years in the Division of Correction after he assaulted an employee at Perkins. (*Id*.) After service of that three-year sentence, King returned to Perkins.

King's psychiatric diagnoses are: schizoaffective disorder, bipolar type; substance use disorder (full remission in a protected controlled environment); and anti-social personality disorder. (ECF No. 4 at Ex. 2, p. 3). Symptoms King has experienced include: auditory hallucinations, grandiose and paranoid delusions, rapid and pressured speech, irritability, general mistrust of hospital staff, agitation, violence, non-compliance with prescribed medication, and poor sleep and increased goal-directed activity consistent with hypomania or mania. (ECF No. 4-7 at p. 3, Affidavit of Inna Taller, M.D., Clinical Director at Perkins).

On April 28, 2016, King was transferred to "2 South" from a minimum security ward because of his "increasing agitation, refusal to participate in treatment, and refusal to take medications for his mental illness." (ECF No. 4-1 at p. 2, Affidavit of Angela Onwuanibe, M.D.). After his transfer, King told staff he did not intend to take any of his medications and that he would not work with the treatment team. (*Id*). King was described as "loud, agitated and verbally aggressive" during a meeting with his treatment team, prompting his transfer to a maximum security ward for approximately one month. (*Id*).

King returned to 2 South on June 3, 2016, and remained angry and agitated for "the next several months," complaining about the medications he was prescribed, particularly Lurasidone. (*Id*.) King continued to argue about what medication was appropriate and told his treatment team that he "had no intention of taking more than 5mg of Zyprexa." (ECF No. 4-3 at p. 3). King was reminded that acceptance of treatment was an important part of being approved for housing on a medium security ward. (*Id*). During the November 29, 2016 meeting, King

4

complained about taking Lurasidone and maintained he had been "faking his symptoms all along." (*Id.*)

After King began taking Lurasidone (60 mg), he complained of facial paralysis and numbness. He attributed the symptoms to Lurasidone. (ECF No. 4-1 at p. 2; ECF No. 4-7 at pp. 3 – 4). When King made these complaints he was evaluated by his somatic physician, Dr. Jagdish Shesadri, who could not substantiate King's symptoms. (ECF No. 4-1 at p. 2). Despite the lack of evidence of adverse side-effects caused by the Lurasidone, Dr. Onwuanibe reduced the dosage of Lurasidone prescribed from 60 mg to 40 mg. (*Id*).

Because King also expressed concerns regarding the tremors he suffers and his fear that Lurasidone was causing him to suffer strokes, he was referred to UMMC for neuroimaging studies, evaluated by a neurologist at University of Maryland (February 2017), and provided with a consultation with a clinical pharmacist. (*Id*). An MRI of King's brain, ordered when King expressed concern that Lurasidone caused him to have a stroke, revealed no significant intracranial abnormality, *i.e.*, King had not suffered a stroke. (*Id*). The neurologist who examined him noted that King had a tremor in his hands, but that it did not appear to affect his daily life. She also concluded that King appeared to be stable on his medication regimen and did not recommend any changes. (ECF No. 4-5 at p. 3 Neurological Consultation Report, February 15, 2017, Dr. Neil C. Porter).

While King was compliant with the Lurasidone prescribed, his demeanor and behavior improved. Between his Individual Treatment Plan meeting (ITP) on January 24, 2017 and May 2, 2017, King was "elected president of the ward and did an excellent job." (ECF No. 4-1 at p. 3). King was described as cooperative on the unit and compliant with both treatment and medication. (*Id.*)

On or about June 9, 2017, however, King was observed by staff as hypomanic and easily agitated. (ECF No. 4-1 at p. 4; ECF No. 4-6 at p. 1, Monthly Update Note by Angela Onwuanibe, M.D.). Further, King was observed shouting at his peers and engaging in provocative behavior with staff. (*Id*). He admitted he had slept poorly and was experiencing "excessive activity" but denied these things were symptoms of his illness. (*Id*). Dr. Onwuanibe encouraged King to focus on his treatment and to tone down his behavior, but King became agitated during their meeting and resigned his position as president of the unit. (*Id*). Dr. Onwuanibe then informed King that in light of his worsening symptoms his medications should be increased, but King refused and became verbally aggressive. (*Id*). She further observed that "[s]ince his medication increase to 40 mg of Latuda [Lurasidone] he has refused his Latuda. He makes several negative comments in the milieu creating a hostile environment. He is unable to accept that he may be sick again." (*Id*).

On June 13, 2017, Dr. Onwuanibe again met with King, who remained hostile and continued to refuse to take his medication. (*Id*). King told Dr. Onwuanibe to take the medication herself. (*Id*).

On June 15, 2017, Dr. Onwuanibe decreased the Lurasidone from 40 mg to 20 mg in an effort to ensure King received some treatment to prevent his illness from worsening. (*Id*). In addition, King's lithium dosage was increased slightly. (*Id*). Although it was noted that King was not cooperating with treatment, his level of security was not changed because there was no evidence that he presented an imminent danger to himself or others. (*Id*. at p. 2).

Dr. Taller offers her opinion "to a reasonable degree of medical certainty that it was and is appropriate to prescribe Lurasidone to Mr. King." (*Id*). She explains that:

> Mr. King is diagnosed with a chronic and severe mental illness. When non-adherent to the prescribed medications his active symptoms have led to

violence, prevented his progress in the hospital, and have precipitated multiple arrests and hospitalizations. Lurasidone is an antipsychotic, which serves as the most appropriate medication type for treatment of Schizoaffective Disorder. Most atypical antipsychotic medications contain a precautionary warning about a possibility of a stroke when used in elderly patients with dementia-related psychosis. This does not apply to Mr. King as he does not carry the diagnosis of dementia. He is also properly prophylactically medicated with Clopidogrel[4] and Aspirin to minimize the recurrence of a TIA. Therefore, the benefits of Lurasidone significantly outweigh the potential risks.

(ECF No. 4-7 at pp. 4 – 5).

## II. Standard of Review

### A. Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw

---

[4] Clopidogrel helps prevent platelets in the blood from sticking together and forming a blood clot and is used to prevent blood clots after a recent heart attack or stroke and in people with certain disorders of the heart or blood vessels. *See* https://www.drugs.com/mtm/clpidogrel.html.

all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

B. Injunctive Relief

A preliminary injunction is an "extraordinary and drastic remedy." *See Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). To obtain a preliminary injunction, a movant must demonstrate: 1) that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in his favor; and 4) that an injunction is in the public interest. *See Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at, 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)).

III. Analysis

A. Retaliation

In order to prevail on a claim of retaliation, King "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself

violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). To make out a prima facie case of retaliation, King has the burden of showing that retaliation for the exercise of protected conduct was the "substantial" or "motivating" factor behind the conduct of Defendants. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). After a prima facie showing is made, the burden shifts to Defendants to demonstrate that they would have reached the same decision even in the absence of the constitutionally protected conduct. *Id.*

King's assertion is that his medication dosage was changed in retaliation for filing a lawsuit in this court. King's claim fails because there is no evidence, or any facts from which it could be reasonably inferred, that Defendants' clinical decision to change King's Lurasidone dose was in any way motivated by his decision to file a lawsuit. Rather, the verified business records supported by affidavits establish that King's deteriorating behavior on the ward was the beginning of a familiar pattern indicative of a worsening of his illness. The increase in Lurasidone was purely a medical decision and not one that can be attributed to a retaliatory motive. Additionally, King's concerns regarding possible side-effects were not ignored and, despite any objective evidence to support those concerns, the Lurasidone dose was reduced.

B.    Due Process

To the extent that King intended to raise a claim that he was denied due process when he was not permitted to refuse prescribed medication, the record evidence does not support such a claim. As an involuntarily committed patient in a State psychiatric facility, King has a "'significant constitutionally protected liberty interest in avoiding the unwarranted administration of antipsychotic drugs.'" *Sell v. United States*, 539 U.S. 166, 178 (2003), quoting *Washington v. Harper*, 494 U.S. 210, 221 (1990). "[W]hen the purpose or effect of forced drugging is to alter the will and the mind of the subject, it constitutes a deprivation of liberty in

9

the most literal and fundamental sense." *United States v. Bush*, 585 F.3d 806, 813 (4th Cir. 2009). "Involuntarily committed mental patients retain a liberty interest in conditions of reasonable care and safety and in reasonably nonrestrictive confinement conditions." *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982). The Fourteenth Amendment ensures that states will provide not only for the medical needs of those in penal settings, but for anyone restricted by a state from obtaining medical care on his own. *See DeShaney v. Winnebago*, 489 U.S. 189, 200 (1989); *Youngberg*, 457 U.S. at 324.

Maryland law provides for involuntary psychiatric medication under limited circumstances. Under the applicable statute:

> (b) Medication may not be administered to an individual who refuses the medication, except:
>
> > (1) In an emergency, on the order of a physician where the individual presents a danger to the life or safety of the individual or others; or
> >
> > (2) In a nonemergency, when the individual is hospitalized involuntarily or committed for treatment by order of a court and the medication is approved by a panel under the provisions of this section.

Md. Code Ann., Health-Gen. §10-708(b). King exercised his right to refuse medication and in the context of the instant case, no clinical review panel was convened to consider involuntary administration of the medications prescribed because King did not meet the criteria for involuntary medication. (ECF No. 4-7 at p. 5; Affidavit of Inna Taller, M.D.).

In his opposition, King asserts that his newly assigned psychiatrist, Dr. Chandran, agreed to reduce his medications significantly and to eliminate the Lurasidone prescription. He claims that Dr. David Chandran was then convinced to change his position by Dr. Taller and he is now being medicated for the purpose of incapacitating him and/or to cause him to suffer a stroke.

10

(ECF Nos. 8 and 9). Defendants indicate in their reply that Dr. Chandran initially agreed with King's suggestion to reduce his medication, but consulted with Dr. Taller about King's treatment and agreed that King suffers a mental illness and the medications prescribed are appropriate for treatment of that illness. (ECF No. 10-1 at pp. 2 – 3, Affidavit of Inna Taller, M.D.). King remains free to refuse to take the medications, but has not done so. (ECF No. 9 at p. 5, King's opposition). King alleges that he continues to take the medication out of fear of reprisal for refusing to do so. He claims that if he stops taking the Lurasidone he faces transfer to the maximum security ward where he claims he would be over-medicated and thereby unable to litigate his claims in this court.[5] (*Id*. at pp. 4 – 5). King further asserts that this court should transfer him to another facility because he is in danger of suffering another TIA or a stroke if he is required to stay at Perkins and comply with the medication regime. (*Id*.)

King's continued insistence that he is forced to take medication that is a danger to his health and that a transfer to another facility is the only plausible option to protect his safety is simply unsupported by the record evidence. Perkins staff members have been responsive to King's concerns about side-effects and have provided him with consultations as well as imaging studies in an effort to quell those fears. Upon learning that King no longer wishes to be at Perkins, Dr. Taller indicates that she presented a request for King to be transferred to another Maryland Department of Health facility. (ECF No. 10-1 at p. 3). Chief among the reasons the request was denied are that King is currently symptomatic and he does not follow treatment recommendations. (*Id*.) The actions taken by Defendants and Dr. Taller are not indicative of the nefarious purpose attributed to them by King, nor has King been deprived of a protected liberty interest without due process of law.

---

[5] Defendants deny that King would be transferred to a higher security based solely on his refusal to take prescribed medications and deny they would request authority to medicate him involuntarily based only on that refusal. (ECF No. 10-1 at p. 3).

IV.     Conclusion

The extraordinary injunctive relief sought by King is not supported by the undisputed facts in the record before this court. There is no evidence that King is being improperly medicated or that he has been denied his right to decline taking medication to which he objects. Rather, the record is replete with evidence that supports Defendants' position that King's medications were increased based on an increase in psychiatric symptoms and that despite his right to do so, King has not refused to take the medication he claims poses a threat of harm to his health. Defendants' response to show cause, construed as a motion for summary judgment, demonstrates their entitlement to judgment in their favor. By separate Order which follows, the motion will be granted.


December 4, 2017                      _____/s/_____
                                      DEBORAH K. CHASANOW
                                      United States District Judge